## UNITED STATES v. WETHERELL.

(Circuit Court of Appeals, First Circuit. November 13, 1894.)

### No. 93.

CUSTOMS DUTIES—STEEL STRIPS.

Strips of steel, 3 inches wide, from 100 to 250 feet long, and less than $^{25}/_{1000}$ of an inch in thickness, which have been shaped by passing through cold rolls, are dutiable as "flat steel wire, or sheet steel in strips," under paragraph 148 of the tariff act of October 1, 1890.

This was an application by Frank J. Wetherell for a review of the decision of the board of general appraisers concerning certain merchandise imported by him. The collector levied a duty upon such merchandise of two cents per pound, under paragraph 146 of the tariff act of October 1, 1890, and an additional duty of one-fourth of a cent per pound, under paragraph 152 of said act. The board of general appraisers, upon appeal by the importer against the imposition of the additional duty under paragraph 152, held that the merchandise was dutiable at 50 per cent. ad valorem, under the second proviso of paragraph 148 of said act. The circuit court reversed the decision of the board of general appraisers, and held the merchandise dutiable under paragraph 146, without additional duty under paragraph 152. 60 Fed. 267. The government appeals.

Sherman Hoar, U. S. Atty., and William G. Thompson, Asst. U. S. Atty.

Joseph H. Robinson, for appellee.

Before PUTNAM, Circuit Judge, and NELSON and WEBB, District Judges.

PUTNAM, Circuit Judge. This case turns on the construction of certain words in the tariff act approved October 1, 1890 (chapter 1244), found in paragraph 148 (26 Stat. 577), namely:

"And provided further, that flat steel wire, or sheet steel in strips, whether drawn through dies or rolls, untempered or tempered, of whatsoever width, twenty-five one thousandths of an inch thick or thinner (ready for use or otherwise), shall pay a duty of fifty per centum ad valorem."

The expression "sheet steel in strips" is not found in any prior customs legislation. The article in question was invoiced as "cold rolled cast steel," is claimed by the importer to be known commercially as "common cold rolled cast steel," and steel of its class is said by him to be intended for clock springs, shoe shanks, and other cognate purposes. This particular importation was for use in the manufacture of clock springs. It was of the invoice value of about $6\frac{1}{2}$ cents per pound, and in strips three inches wide, and of No. 26 wire gauge in thickness, thinner than $^{25}/_{1000}$ of an inch. Strips of this class are from 100 feet to 250 feet long. These had not been

drawn through dies, but they received their shaping by passing through cold rolls. There is some evidence that they were rolled through grooved rolls, and also that, after being first rolled horizontally, they were rolled vertically for the purpose of shaping their edges. It is conceded that they were not obtained by stripping up sheets. It is also clear that what is commercially known as sheet steel is rolled hot in mills called "sheet mills," especially adapted for the purpose, between rolls running so slowly that the sheets cannot be run over 12 feet in length, and that the sheets ar~ not less than 8 inches wide. There may be exceptions as t· dimensions, but so rare as not to disturb the rule. The im' and all the witnesses called in his behalf admit that the in: tion responds to the word "strips" found in the statutory expr' in question. Strips sheared from sheet steel, as sheet steel is mercially known, have been dealt in for a number of years to extent; but, although it is claimed that they have been impo. ..., yet the evidence on this point is not clear, and certainly these importations, if made at all, have been of such minor importance that they could have hardly been in contemplation in the enactment which we are now considering. On the other hand, the importations of steel of the class in question have been considerable, and to such an extent that their influence has been felt by manufacturers of steel in the United States. Flat steel wire may be drawn through dies or rolls, and it is without any absolute standard of width or thickness. It appears that the nomenclature covering the various steel productions we are considering is very loose, and we are of the opinion that the class of importations in question and flat steel wire might run into each other; in other words, that there might be a margin where it would be doubtful whether the product should be designated as flat steel wire or as strips or ribbons of steel.

Some controversy arises touching the interpretation of the word "drawn," as used in the statutory provision in question. It is claimed by the importer that, notwithstanding this word is used in connection with the words "through dies or rolls," it must be interpreted in its primary sense of "dragged" or "pulled"; that steel wire is sometimes drawn—that is, pulled—through rolls to flatten it, or to even it; and that in no event can the words "whether drawn through dies or rolls" apply to the importation in question. It must be admitted that the word "drawn," when used as an adjective in describing steel as "drawn steel," distinguishes from steel which merely passes through rolls. Yet in the provision under consideration the word is used as a verb, and in that use it was well known, with reference to ductile metals, in a sense other than its primary one, long before the art of drawing through dies existed. The verb "draw" is recognized by all lexicographers as sometimes meaning extending in either length or breadth by hammering or other forging. Indeed, this secondary sense was evidently its primary sense in the art of working ductile metals. Both the importer and his witnesses, on being cautioned, are careful to limit it to some method of operation which involves the application of some force exterior

to the dies or rolls, for the purpose of pulling or dragging the rod, bar, wire, or strip through them; but, when not thus cautioned, they use it in connection with every method of reducing by dies or rolls the thickness of the metal, and at the same time increasing its width or length.

At the date of the passage of the tariff act of 1890, there was no article well known commercially as "sheet steel in strips," although otherwise with "flat steel wire" and "sheet steel." We agree that at that time the words "sheet steel" had a settled commercial interpretation; that in the state of the art, as it then existed, sheet steel, as commercially known, was not easily confounded with other forms of steel; that the importation in question was not sheet steel, as commercially known; that the words "sheet steel," if they stood alone, would be construed with reference to their well-known commercial meaning; and that, as the words "sheet steel in strips" are not proved to be a well-known commercial designation of goods or manufactures, they also, standing alone, might be construed as meaning steel prepared in sheets in the ordinary sheet mills, and then in some way cut or sheared into strips. So far we agree with the reasoning of the circuit court; but, in our opinion, we are, nevertheless, controlled by the statutory context, and by some of the facts which we have stated.

It is not now claimed that this importation had advanced so far as to be subject to the additional duty, under paragraph 152; and the question submitted for our determination is whether it is subject to a duty of 50 per cent. ad valorem, under the provision we have already cited, and as determined by the board of general appraisers, or of only 2 cents per pound, under paragraph 146, as claimed by the importer's protest and determined by the circuit court.

It is claimed in behalf of the importer that, when a question of this character is one of doubt, the doubt must be resolved in favor of the importer; that the intention of congress to impose the higher rate of duty should be expressed in clear and unambiguous language; and that this case comes within that rule. In the first place, it is not easy for a court to find, on this record, whether the duty imposed by paragraph 148 is always a higher rate than the graded specific duties imposed by paragraph 146; and therefore it is not for us to say that the facts call for the application of the rule of law in question, even if it went to the extent claimed for it. Although this particular importation was clock-spring steel, said to be worth 6½ cents per pound, yet other strip steel, clearly to be classed for duties with it, is of a lower grade,—some of it known as "corset steel," and, as stated by one witness, of about one-third of the value of this in question. Therefore, under one grade in paragraph 146—that of a valuation of above $2^2/_{10}$ cents, and not above 3 cents, per pound —the specific duty might exceed 50 per cent. ad valorem, and with a like possible result in the grade next specified. There is nothing in the record to enable the court to determine the full value or effect of this fact, or to ascertain whether, if the present importer claims the application of paragraph 146, the next importer of strip steel may not claim the application of the provision against which the

present one objects. So far as this rule of interpretation has any application, it must, of course, be limited to cases where it relieves all importers of all articles whatsoever of the class concerned. The rule has received no practical construction by the supreme court, so far as decisions of that court have been brought to our attention. The first case was U. S. v. Isham, 17 Wall. 496, which related to the question whether a certain instrument was subject to a stamp duty or not; and, although the court stated generally the rule relied on by the present importer, it disposed of the case without coming to any application of it. The next was Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. 1240. This raised a question as between free and dutiable goods; but the court concluded that the decision of the circuit court was correct, and continued: "But, if the question were one of doubt, the doubt would be resolved in favor of the importer." The court did not go beyond the hypothesis, so that it had no occasion to apply the rule under consideration. In like manner, in the well-known case of Twine Co. v. Worthington, 141 U. S. 468, 12 Sup. Ct. 55, the court, on page 474, 141 U. S., and page 55, 12 Sup. Ct., said that the intention of congress was plain. This, of course, was enough to end the litigation. Earnshaw v. Cadwalader, 145 U. S. 247, 12 Sup. Ct. 851, turned on an issue for the jury. The court merely stated the ordinary rule that the jury must be satisfied by a preponderance of evidence, and that the case was not within the earlier ones to which we have referred. There can be no question as to the general proposition; yet, like all rules of construction.of a similar character, we presume it has no practical use except in cases of extraordinary doubt. It has a more appropriate application when the question is one of any tax at all; and the federal reports are full of suits where the courts have not hesitated to perform the duty of determining mere questions of classification where it was admitted some duty was to be imposed, in favor of the higher rate, under circumstances of great difficulty. The rule, in any view of it, fails to aid us in the solution of this case.

The limitations and application of the rule under which customs statutes are usually construed according to commercial nomenclature are too apparent, in the light of plain principles of construction, to need explanation so far as concerns this case. Although, if the expression "sheet steel in strips" stood alone, it might be interpreted as we have said, yet here, as everywhere, this yields to surrounding facts and the context. While the words in question, standing alone, might well have the sense we have explained, yet to the common understanding they are not inapt to cover the importation in this case. Indeed, a very large manufacturer of this and analogous steel products testified that it is generally spoken of in his mill as "sheet steel." Therefore, it is not unreasonable to suppose that congress spoke in the same language, or at least regarded this importation as covered by these words. Whether it did so or not is the turning point of this appeal.

We attach great weight to the fact that sheet steel in strips, as defined by the importer, had not been imported, or certainly only to the minor extent already described; while the article in question

in this case had been imported to a sufficient extent to come in competition with our own manufacturers, and is not specifically provided for, unless in these words. We, therefore, conclude that congress intended to legislate for the latter, and not for the former. The connection with the words "flat steel wire" can hardly be explained, except by the suggestion that congress had in mind analogous matters. We refer to the fact that flat steel wire and steel in strips, like this importation, might well have been considered by congress as running into each other, and that congress united these in one provision in order to remove all doubts arising from nomenclature, or from the successful use of new methods to evade a rigid description. We are, however, particularly impressed by the words "whether drawn through dies or rolls." Sheet steel, as commercially known, cannot, for any practical purpose, be drawn through dies, or, if at all, only in such rare cases as not to occupy the attention of either congress or the trade. Flat steel wire, as we have seen, is drawn either through dies or rolls; but, if these words "whether drawn through dies or rolls" had relation only to flat steel wire, their location would have been other than it is. We are unable to reconcile the putting by congress of this expression in the place where it stands with the interpretation laid by the importer on the words "sheet steel in strips." It is easily explained on the assumption that congress understood that "flat steel wire" and importations of the kind in question are of an analogous character, are liable to run into each other, and therefore needed to be provided for in the same class. Further, the words "of whatsoever width" conform to the purpose we assign to congress of shutting out doubts as between flat steel wire and steel strips, and they have no force or purpose except on that hypothesis. Indeed, taking the whole together, we are satisfied that congress intended by this provision to cover flat wire, ribbons of steel, and strips of steel, however designated in the trade, and of whatever width, not exceeding the thickness stated by it, and however produced, whether through dies or rolls, and to do it all by such sweeping provisions that they could not be evaded by any of the distinctions raised in the case before us. The proposition that this result charges congress with tautology overlooks the fact that the provision in question does not cover all strips, but only those of a specified maximum gauge.

The collector assessed in this case one rate of duty, the importer in his protest insisted on another, and the general appraisers found that a third was the correct one. We agree with the latter. Under these circumstances, and in view of In re Collector of Customs, 5 C. C. A. 101, 55 Fed. 276, we are not disposed to anticipate any questions which have not been submitted to us by counsel.

The judgment of the circuit court is reversed, and the case remanded to that court, for further proceedings consistent with this opinion.