## DEJONGE v. MAGONE.

**ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.**

No. 56. Argued November 1, 1895. — Decided November 18, 1895.

Papers, coated, colored and embossed to imitate leather, and papers coated with flock, to imitate velvet, imported into the United States in 1888, were subject, under Schedule M of the tariff act of March 3, 1883, c. 121, to a duty of 25 per cent *ad valorem*, as "paper hangings . . . not specially enumerated or provided for in this act," and not to a duty of 15

per cent *ad valorem*, as manufactures of paper, or of which paper is a component material, not specially enumerated or provided for in this act.

THE action below was brought to recover the amount of alleged excessive exactions imposed by the defendant, while collector of the port of New York, as duties upon two importations into the port of New York made by the plaintiffs in 1888, of two kinds of paper, the one coated, colored, and embossed to imitate leather; the other coated with flock to imitate velvet; which importations were classified by the collector as dutiable under Schedule M of the tariff act of March 3, 1883, c. 121, 22 Stat. 488, 510, which reads as follows:

"Paper hangings and paper for screens or fireboards, paper antiquarian, demy, drawing, elephant, foolscap, imperial, letter, note, and all other paper not specially enumerated or provided for in this act: twenty-five per centum *ad valorem*."

The goods were described in the invoices as "manufactures of paper," and in their protest the importers claimed that they were dutiable at only fifteen per cent *ad valorem*, under a paragraph of the same schedule of the act referred to, which reads as follows:

"Paper, manufactures of, or of which paper is a component material, not specially enumerated or provided for in this act: fifteen per centum *ad valorem*."

A member of the plaintiff firm testified, and the evidence generally tended to show, that the articles in question were embraced in a class of surface coated papers, known to commerce and trade at the time of the passage of the tariff act of 1883 as "fancy papers," and were specifically designated and known to the trade at that time, the imitation of leather paper as "embossed paper" or "morocco paper," and the other as "imitation of velvet paper."

The process by which fancy papers of the character referred to are produced, while requiring different machinery, the employment of workmen not accustomed to making ordinary paper, or the completed paper which is used in this manufacture, yet is substantially the same method as is used in the manufacture of wall paper. Indeed, the unquestioned proof

was, that paper as completed in paper mills, in order to make wall paper, is subjected to further treatment to fit it for the new use. As to the imitation of leather paper, there are no ingredients contained in it not found in ordinary paper, though the sizing and coloring are different.

In the production of these fancy papers, printing paper or sized paper, white and manilla papers as completed in the paper mills are used. In the case of imitation of velvet paper, the process consists in first putting a strong sizing on the paper, then sifting the different colored flocks in the wet sizing, and then drying the product; and, in the case of the paper coated, colored, and embossed to imitate leather, color is first laid upon the paper, it is then dried, sized, and finally passed through engraved steel rollers, which emboss its surface. It was in evidence that the embossed or morocco paper was used to cover books, for covering paper boxes, for album covers, fancy boxes, or sample cards, for pocket-books, for pamphlets, and for a great many other purposes to imitate leather; and the imitation of velvet paper was used for mats to contain photographs, to frame photographs, for fancy boxes to imitate velvet, and also for wall decoration. A witness for the defendant testified that imitation velvet or flock paper had been used to put upon walls for more than forty years, and that the product when intended for use as wall paper was put up in rolls. In the catalogue issued by plaintiffs to the trade, put in evidence, and in which, as testified to by one of the plaintiffs, the imitation of velvet paper was embraced under the designation of "Leather Papers," the following appears:

"Leather Papers.

"Our own manufacture.

"$20.00 per ream of 500 sheets, 20 x 25.

"$2.00 per roll of 25 inches by 25 yards.

"Prices subject to the fluctuations of the market.

"These goods come in nine colors, as follows: Russia red, Turkey red, leather color, light brown, dark brown, light blue, navy blue, dark green, and black, and can be had in plain or smooth, seal grain, alligator, bamboo, and other

patterns; are waterproof finished on the best 40-pound rope manilla stock."

At the close of the evidence each party moved for a peremptory direction to the jury, and exceptions were duly taken and noted to the overruling thereof.

The following requests to charge were submitted on behalf of the plaintiffs, and a separate exception taken to each refusal so to instruct the jury :

"5. If the articles in suit are made by the addition of foreign substances to paper not covered by the popular definition nor the dictionary definition of paper, they cannot be classified as paper for purposes of duty.

"6. Unless you find that trade and commerce in 1883 and theretofore in this country had affixed a different meaning to the word 'paper' from the ordinary meaning, the articles here in suit not being within the latter, are not to be assessed as paper."

"8. The general words of section 392 of the tariff must be construed as though they read 'and all other papers of that class (designated by the nine preceding words) not specially enumerated or provided for in this act,' and unless you find that the articles in suit belong to that class they cannot be considered as provided for in section 392, unless by the words 'paper hangings and paper for screens and fireboards.'"

The plaintiff also excepted to the following portion of the charge of the court :

"Was this article, in the trade and commerce of this country, when Congress legislated in 1883, a variety of paper ? In other words, if the committee of Congress that framed this act and reported it to Congress had turned to the trade and commerce of this country of 1883 and had asked that trade for a comprehensive list of all kinds of paper known to them and dealt in commercially as such, would paper like this have been included in such list ? If the commerce of the country had furnished to the committee of Congress, in answer to such a request, a list of all the kinds of paper known to that trade, and if such list enumerated articles like these, then they are covered by the phrase 'all other papers' in paragraph 392.

The collector was right, and the defendant is entitled to a verdict. If, on the other hand, an article such as this would not have been included in that list at that time, then the plaintiff, having established by the proof that they are manufactures of paper, is entitled to your verdict."

The full charge to the jury is contained in 41 Fed. Rep. 432.

*Mr. Albert Comstock* for plaintiff in error.

*Mr. Assistant Attorney General Whitney* for defendant in error.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

The paragraph of the tariff act of March 3, 1883, c. 121, 22 Stat. 488, 510, under which the classification complained of was made, is contained in the statement of facts. It is contended by counsel for plaintiffs in error that it should be construed so as to read as follows:

" Paper hangings and paper for screens or fireboards, paper antiquarian, demy, drawing, elephant, foolscap, imperial, letter, note, and all other paper (*of the class of paper antiquarian, demy, drawing, elephant, foolscap, imperial, letter, and note*) not specially enumerated or provided for in this act: twenty-five per centum *ad valorem*."

This contention is based upon the claims that —

*a.* The products in question are *manufactures* of paper as contradistinguished from paper, because completed paper, as produced in paper mills, is but one of the tangible ingredients, the other products, sizing of a particular description, water-color paints, wood flock, and the like, being materials entirely foreign to the art of the paper maker, and that complete merchantable paper is employed simply as the material, and is subjected to elaborate mechanical processes involving the employment of machinery entirely unknown to the paper maker's art, and operated by workmen who are not paper makers; and,

*b.* That paper hangings and paper for screens and fire-boards are a group of products manufactured from an inferior grade of paper stock, and standing equivocally between paper and manufactures of paper, and that as the other nine articles enumerated in the paragraph under which the classification of plaintiff's importations was made, viz., paper antiquarian, demy, drawing, elephant, foolscap, imperial, letter, and note paper, are of the writing and drawing class of papers, a high grade of paper stock, and solely the product of paper mills, nothing is paper within the meaning of the term, as it is employed in the expression, "and all other paper not specially enumerated or provided for in this act," which is not of the class of papers last enumerated.

But it is established by the evidence beyond dispute that at the time of the passage of the tariff act of 1883 "fancy papers" were largely dealt in in commerce and were well known in the commerce and trade of this country; that there were a great variety of fancy papers, and that such designation covered both the importations out of which this controversy arose. It is not reasonable to suppose that Congress assumed that the manipulation or treatment of particular paper in the completed condition in which produced at a paper mill, by mere surface coating, a process which did not change its form, but only increased the uses to which such paper might be put, had the result to cause the article to cease to be paper and to become a manufacture of paper, especially in view of the continued commercial designation of the article as a variety of paper and its sale and purchase in commerce as paper.

Congress must be presumed to have known that the paper employed in paper hangings and paper for screens or fire-boards was printing paper, sized in the paper mill, and subjected to treatment elsewhere, by which the value of the article as paper was greatly enhanced, and the association of those products with the writing and drawing class of papers in the paragraph in question is convincing evidence that paper hangings and paper subjected to similar processes by which paper hangings were produced was regarded as paper

and not as manufactures of paper. Not alone to avoid doubt and confusion, would such products as paper hangings likely be provided for separately, rather than in association with writing and drawing papers, if deemed to be "manufactures" of paper, but as an article clearly a manufacture of paper, to wit, "paper envelopes," was assessed at a duty of twenty-five per cent. *ad valorem*, opportunity existed to place paper hangings in the same paragraph, and such would likely have been done if paper hangings had been deemed "manufactures of" and not "paper."

Nor is it at all probable that Congress would specifically impose a duty of twenty-five per centum upon paper hangings, and intend that an importation of velvet paper of a similar class to wall paper and used for wall decorations should be assessed as a manufacture of paper at a rate of fifteen per centum *ad valorem*.

While, directly speaking, the products in question might be termed manufactures of the particular variety of paper stock employed as their basis, yet the resultant product of such manufacture was a higher and better grade of *paper*. There was no such change of form as in the case of paper screens, paper boxes, paper envelopes, and other like manufactures of paper. The case is analogous in its main features to *Hartranft* v. *Wiegmann*, 121 U. S. 609, 615, where it was held that shells cleaned by acid, and then ground on an emery wheel, and afterwards etched by acid, and intended to be sold for ornaments, as shells, remained shells, and that they had not been manufactured into a new and different article, having a distinctive name, character, or use from that of a shell.

In the schedule of the tariff act of 1883 under consideration, Congress attempted a classification of paper generally. A duty of twenty per cent was laid upon "paper, sized or glued, suitable only for printing paper;" a duty of fifteen per cent was laid upon "printing paper, unsized, used for books and newspapers exclusively;" a duty of ten per cent was laid upon "sheathing paper;" and all other paper was embraced in the paragraph under which the paper in question was classified and made dutiable at twenty-five per centum *ad valorem*.

As cheaper grades of paper than the writing and drawing paper enumerated in the paragraph last referred to were elsewhere referred to in the act, it is obvious that the expression "and all other paper not specifically enumerated or provided for in this act" meant precisely what was expressed, and embraced paper *of any grade*, not elsewhere enumerated in the act. "Other paper, not elsewhere provided for," would embrace "tissue" paper, *Lawrence* v. *Merritt*, 127 U. S. 113, and that term would also seem to include the various grades of brown and other wrapping paper, and the rope manilla paper out of which the "leather goods" of plaintiffs in error were produced, even though not of the high grade of paper known as writing and drawing papers.

It follows from what has been stated that the court rightly refused the charges requested by plaintiffs in error. It equally follows that if the word "paper" had a well-known signification in trade and commerce in 1883, which embraced these products, that meaning would control. *Cadwalader* v. *Zeh*, 151 U. S. 171, *and cases cited* p. 176. This principle clearly authorized the court to submit to the jury the question : "Was this article, in the trade and commerce of this country, when Congress legislated in 1883, a variety of paper ?" and to instruct them, in the event they answered the question in the affirmative, to find in favor of the collector.

*Affirmed.*