### UNITED STATES v. MASSACHUSETTS GENERAL HOSPITAL.

(Circuit Court of Appeals, First Circuit. April 10, 1900.)

#### No. 313.

1. CUSTOMS DUTIES—CLASSIFICATION—SCIENTIFIC INSTRUMENTS.
    Paragraph 585 of the tariff act of 1894, which permits the free importation of "philosophical and scientific apparatus, utensils, instruments, and preparations" for certain uses, among others for the use of institutions incorporated or established for educational or scientific purposes, is entitled to a liberal construction, the exemption having in view the highest interests of the public, and being one which has been made, in some terms, in every customs act. The addition in the later statutes of the word "scientific" to the word "philosophical," which was used alone in the earlier enactments, must also be held, under general rules of construction,

to have broadened the exemption. Surgical instruments, designed and adapted for use in practical surgery, are scientific instruments, and within the exemption, when specially imported in good faith by a general hospital, maintained, among others, for educational purposes, for use in its clinics and training school for nurses.

2. SAME.

It is immaterial that the act of incorporation of such hospital did not specifically recognize or provide for its educational features, but that the same were of subsequent growth.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion of circuit court, see 95 Fed. 973.

Boyd B. Jones, U. S. Atty. (Albert H. Washburn, Asst. U. S. Atty., on the brief), for appellants.

Thomas Hunt (Gaston, Snow & Saltonstall, on the brief), for appellee.

Before PUTNAM, Circuit Judge, and WEBB and ALDRICH, District Judges.

PUTNAM, Circuit Judge.   This appeal relates to the construction of so much of paragraph 585 of chapter 349 of the statutes of 1894 (28 Stat. 543) as permits the free importation of "philosophical and scientific apparatus, utensils, instruments, and preparations" for certain uses therein pointed out, including for the use of institutions "incorporated or established" for educational or scientific purposes.   This importation consisted of instruments especially designed and adapted for use in surgery, and such as are ordinarily used by surgeons in the practice of their profession; but it was made exclusively for use at the hospital, as well for scientific investigation as for surgical operations.   Of course, the instruments were usable, and intended to be used, for surgical instruction to medical students.   There is no suggestion that they are usable for any other purpose than those which we have stated.   The main question is whether such instruments, conforming in other respects to the conditions of paragraph 585, may be classed under the word "scientific," found therein.   Paragraph 585 was in issue in U. S. v. Presbyterian Hospital, 18 C. C. A. 338, 71 Fed. 866, 38 U. S. App. 201, before the circuit court of appeals for the Second circuit.

Exemptions of the character shown in this paragraph have always been within the policy of our customs laws.   The act of August 10, 1790, c. 39, § 1 (1 Stat. 180), exempted "philosophical apparatus, specially imported for any seminary of learning," and that exemption was renewed in practically the same terms until 1816.   From that time until the act of March 3, 1857 (11 Stat. 192), the exemption was continued, with a gradual enlarging phraseology, always retaining the word "philosophical," but never inserting the word "scientific." Since 1857 exemptions for the same substantial purposes have been renewed in every statute, except for a time a moderate duty of 15 per cent. ad valorem was imposed.   The exemption first came into practically the form in which we now find it—that is to say, "philosophical and scientific apparatus, instruments, and preparations"—

in the act of 1870, c. 255, § 22 (16 Stat. 268). The act of 1894 differs from that only in adding the word "utensils."

Paralleling this legislation, there have been other lines; though, for this case, it is not necessary to go back of the Revised Statutes. There a duty of 40 per cent. ad valorem was imposed on "philosophical apparatus and instruments." Rev. St. (2d Ed.) § 2505, p. 487. This is not found in the act of 1894; but it appears in the act of 1883, c. 121 (22 Stat. 513). It was this provision of the act of 1883 which was under consideration in Robertson v. Oelschlaeger, 137 U. S. 436, 11 Sup. Ct. 148, 34 L. Ed. 744. Another line of parallel legislation is that relating to "professional books, implements, instruments, and tools of trade, occupation, or employment," found in paragraph 596 of the act of 1894, now under consideration. No provision of this broad character was in the act of 1883, that being limited to professional books. 22 Stat. 518.

. As customs legislation has a peculiarly practical purpose, and appeals directly to the commercial community, the rules of construction which apply to its schedules of rates have never been of a refined character, and have come down, mainly, to the following propositions:

First. The language of commerce, when used in such statutes, must presumably be construed according to the commercial understanding of the terms employed. When a term is confined in its meaning to a particular trade, the presumption is that the term is used in its trade signification. Hedden v. Richard, 149 U. S. 346, 13 Sup. Ct. 891, 37 L. Ed. 763; Dejonge v. Magone, 159 U. S. 562, 569, 16 Sup. Ct. 119, 40 L. Ed. 260; Chew Hing Lung v. Wise, 176 U. S. 156, 161, 20 Sup. Ct. 320, Adv. S. U. S. 320, 44 L. Ed. ——. It follows, of course, with reference to provisions relating to philosophical and scientific matters, that the term used ought ordinarily to have such construction as to commend itself to men particularly trained in those directions. The word "scientific," however, covers so many fields, and has so many different phases, that it is impracticable to apply this rule with satisfaction to the case at bar.

Second. Wherever, in the customs laws, generic terms are found, and also specific terms, the latter, within their range, control the former. Fink v. U. S., 170 U. S. 584, 587, 18 Sup. Ct. 770, 42 L. Ed. 1153; Chew Hing Lung v. Wise, supra. Applying this rule to the case at bar, it must be apparent that the mere expression "philosophical and scientific," in one paragraph of the act, is generic, and the mere word "professional," in another, is specific. But the difficulty here is that each paragraph is limited to a particular class of importers, so that, after all, neither is wholly generic, and we are left with the necessity of determining whether congress intended the case as within Magone v. Heller, 150 U. S. 70, 14 Sup. Ct. 18, 37 L. Ed. 1001, or within Chew Hing Lung v. Wise, supra. Therefore this rule only leads us back to the fundamental question involved, without solving it.

Third. The third and the safest rule for the interpretation of customs statutes doubtful in their application is that reiterated last in Chew Hing Lung v. Wise, 176 U. S., at pages 166, 167, 20 Sup.

Ct., at page 324, Adv. S. U. S., at page 324, 44 L. Ed., at page ——, as follows:

"If there had been an intention to include it [meaning the article under consideration] in the dutiable list, especially after these repeated decisions of the treasury that it was entitled to free admission as tapioca, we cannot but believe that congress would have expressed that intention with reasonable clearness."

This supplements the well-known fact that, when the practice of the department, whose duty it is to enforce the law relating to the conduct of the public business, has been uniform with reference to the consideration of a statute found to be doubtful or obscure, great weight should be given to that construction. U. S. v. Healey, 160 U. S. 136, 141, 16 Sup. Ct. 247, 40 L. Ed. 369. The principle applies with special force to the re-enacting of a particular expression of a statute after a decision by the supreme court. This rule, however, fails us here. The only case which touches this topic, and which antedates the act of 1894, is Robertson v. Oelschlaeger, supra. This, as we have said, turned on the construction of a paragraph of the act of 1883, where the word "philosophical" appeared without the word "scientific," so that the court cannot be said to have construed the precise phraseology at bar.

All the departmental decisions prior to the act of 1894 relate to the paragraph in issue in Robertson v. Oelschlaeger, or were a part of the controversy now before us, except the first,—that of August 1, 1879, Synopsis of Decisions (4128),—where the importation was entered as "philosophical instruments." The turning point of that decision was that the importation was not expressly made for the uses covered by the paragraph in issue. The others are as follows: January 13, 1885, Synopsis of Decisions (6719); March 21, 1885, Synopsis of Decisions (6811); September 5, 1889, Synopsis of Decisions (9610); October 3, 1890, Synopsis of Decisions (10,334); January 16, 1891, Synopsis of Decisions (10,603); December 30, 1893, Synopsis of Decisions (14,637).

So far, therefore, as questions of classification are concerned, this rule leaves the case in the same unsatisfactory condition as the other special rules to which we have referred, and the result of the whole is well expressed in U. S. v. Presbyterian Hospital, at page 339, 18 C. C. A., page 867, 71 Fed., and page 208, 38 U. S. App., as follows: "The term [that is, "scientific instruments"] is a very vague one, and there is nothing in the context or in the previous legislation of congress which assists in ascertaining its precise significance." We think, however, that the decisions to which we have referred afford sufficient acquiescence on one proposition now made by the United States to enable us to dispose of it favorably to the importer. The United States claim that, even if the Massachusetts General Hospital has any educational phase, this is not sufficient unless there is some law of the corporation's existence specifically recognizing it. This is too technical, because a statutory enactment of the character of the paragraph in issue here has a generous purpose which cannot recognize such refined distinctions.

The educational phases of the Presbyterian Hospital seem to have

had their origin in all respects in the same way as those of the Massachusetts General Hospital. In each case they were a growth arising from scientific development, and from the modern necessities of securing trained nurses, and of giving medical students clinical instruction. In neither instance, so far as we can discover, was there any express provision as called for by the United States in the case at bar. The Presbyterian Hospital first appears in the treasury decisions in September 5, 1889, Synopsis of Decisions (9610), already referred to. There the character of the institution was shown by a statement of a trustee as follows:

"It is maintained for the two distinct purposes of education and the care of the sick poor, and, while it has no school in the strict sense of that term, its amphitheater is a constant resort of students," etc.

In view of this statement, the treasury department held that the institution was entitled to the benefit of the predecessor of the paragraph here in issue. The next time the character of its organization came before the executive officers was in connection with the ruling of December 30, 1897, Synopsis of Decisions (13,637, G. A. 2395), to which we have already referred, and out of which the case in the circuit court of appeals for the Second circuit arose. As the general appraisers there ruled against the classification of the importation called for by the hospital, nothing will be found in its decision inconsistent with 9610. In U. S. v. Presbyterian Hospital, supra, the court refers, at page 338, 18 C. C. A., page 866, 71 Fed., and page 207, 38 U. S. App., in a general way to the nature of the institution; but at page 339, 18 C. C. A., page 867, 71 Fed., and page 208, 38 U. S. App., it speaks of the matter of classification as "the question" which it had to decide. Everything indicates that ruling 9610 conforms to the settled practice of the department, and the result is fortified by the fact of the re-enactment, both in 1890 and 1894, of the paragraph in exactly the same terms after the ruling of September 5, 1889. This practice so conforms to the meritorious purpose of the exemption in issue that we readily accept it as conclusive. Under the present customs laws, this question is no longer important. Act July 24, 1897 (30 Stat. 200, par. 638).

We have thus sifted the safest rules of construction applicable to questions of this character, with a result so unsatisfactory as to confirm the expression of the circuit court of appeals for the Second circuit, already cited, with reference to the vague character of the expression "scientific instruments." Occasionally courts are forced to resort to the question of "chief use," but, so far as this is attempted to be availed of directly in classifying imported articles, it is "a vague and uncertain term." Magone v. Wiederer, 159 U. S. 555, 562, 16 Sup. Ct. 122, 40 L. Ed. 258. The "chief use," however, sometimes assists in determining the classification, because it sometimes makes clear the true nature of the importation. It is on this account that we have referred to the fact that the invoiced articles were ordinarily and solely used in surgery. This determines the intrinsic nature of the importation, but it is only one step towards ascertaining whether it comes within the exemption.

The word "scientific" came into this paragraph, as we have shown,

many years after its origin, and under such circumstances that, so far from being controlled by the word "philosophical," we are clear that it controls it, and adds to it.   In a very carefully prepared letter from the treasury department of March 21, 1885, Synopsis of Decisions (6811), the following statement was made:

"A committee appointed at the request of this department by the National Academy of Sciences reported, under date of December 2, 1884, that, in their opinion, it was impossible to draw any distinction between the terms 'philosophical' and 'scientific' as used, * * * and that the addition of the word 'scientific' to the word 'philosophical' * * * does not appear to comprehend any objects other than those which may be included under the term 'philosophical.' "

This was readopted by the department in Synopsis of Decisions (10,334), to which we have already referred; but in this case the scientist must yield to the law, because, congress having interpolated the word "scientific," the courts are bound to give some effect to it, and interpret it as adding something to what went before.   Assistance will be found in that direction in the article on philosophy in the Encyclopedia Britannica.   The article says:  "Philosophy claims to be the science of the whole."   "The task of co-ordination in the broadest sense is undertaken by philosophy."   "Philosophy corrects in this way the abstractions which are inevitably made by the scientific specialists."   Nothing can be more marked than this:

"Evidently, therefore, the relation existing between philosophy and the sciences will be to some extent one of reciprocal influence.  The sciences may be said to furnish philosophy with its matter, but philosophical criticism reacts upon the matter thus furnished, and transforms it."

While, therefore, from a certain point of view, the result which the department obtained from the National Academy of Sciences may be true, yet, clearly, it is not so far true as to necessitate in every aspect the refusal to apply the rule of law which requires that the additional word "scientific" should be regarded as presumably enlarging the scope of the statute.  But even this does not solve the difficulty, because the question remains, how far is the scope enlarged?  The antithesis between philosophy and science thus stated in the Encyclopedia Britannica was undoubtedly familiar to the committee who undertook to assist the department, and also to the department; and each probably assumed that the Encyclopedia, and all similar discussions of this question from the higher point of view, regard both philosophy and science as apart from the practical professions like that of surgery.  The circuit court of appeals for the Second circuit, which, under the practice in this circuit, we are bound to follow unless there is some strenuous reason to the contrary, at page 339, 18 C. C. A., page 866, 71 Fed., and page 210, 38 U. S. App., said that congress, by adding the word "scientific," "intended to enlarge the category of favored articles."  This also is indefinite; so that, after searching out all the special rules of construction, we are compelled to resort to the more general rules. We must look at the general purpose of the statute, and to the rule frequently stated, but not often applied, that in cases of doubt the doubt must be resolved in favor of the importer.  In U. S. v. Weth-

ercll, 13 C. C. A. 264, 65 Fed. 987, we examined this last rule of con-struction, and found it to have a narrow application, only under cir-cumstances where the ordinary rules fail. The case at bar is within that limitation. Among the uses of the word "science," it cannot be denied that practical surgery is ordinarily thus spoken of. In the Century Dictionary "medicine" is described as "a lucrative science," "a professional science." With "medicine" are included "theology" and "law." Webster's Dictionary describes surgery as "a branch of medical science." So it puts no strain on the use of the word "scientific" in the statute under consideration, as there are no special circumstances to the contrary, to hold that it covers surgery. Balancing the reasons for and against this construction, it would be frivolous to maintain that the entire mass of strictly surgical articles used for the classes of institutions described in the paragraph in issue, wherever they exist throughout the country, is of so large a volume that the free importation of the whole could be so far prejudicial to any interests that one could argue therefrom that congress intended to tax any of it. Indeed, in construing legis-lation of this character, which has in view the highest interests of the public, and has existed from the origin of our government, the fair rules of interpretation mean liberality, and a broad application of words and expressions, adapted to work out the beneficial pur-pose intended.

In reaching our conclusion we think we are sustained by both Robertson v. Oelschlaeger, 137 U. S. 436, 11 Sup. Ct. 148, 34 L. Ed. 744, and U. S. v. Presbyterian Hospital, 18 C. C. A. 338, 71 Fed. 866, 38 U. S. App. 201, although both cases seem to have been, to some extent, accepted as having the contrary effect. U. S. v. Pres-byterian Hospital is not so specific, and the report of the case is not so clear, that we are bound by it with reference to the particu-lar items of the importation before us. Nevertheless, as we will see, it goes a long way towards supporting the conclusion which we have reached. Robertson v. Oelschlaeger, at pages 438, 439, 137 U. S., page 148, 11 Sup. Ct., and pages 744, 745, 34 L. Ed., divides the entire mass of imported apparatus and instruments into two classes, and it enforces this by repeating it several times in different forms. These classes are, perhaps, as well described in the conclud-ing sentence at the foot of page 438 and at the top of page 439, 137 U. S., page 148, 11 Sup. Ct., and pages 744, 745, 34 L. Ed., as any-where,—one, "philosophical apparatus and instruments"; the other, "implements for mechanical or professional use in the arts." There-fore, when congress introduced the word "scientific" it necessarily drew from one of these classes. From which did it draw? Cer-tainly not from the philosophical, and it must have drawn from the implements which the opinion describes as "for mechanical or profes-sional use in the arts." Therefore what comes from this aids the appellee, rather than the appellants; and we will find the case fur-ther useful when we compare its actual results with those of U. S. v. Presbyterian Hospital.

The first difficulty in apprehending the latter case comes from the fact that it is reported with a simple order of reversal. An

inspection of the original record shows that the judgment of the court was to the effect that the decision of the circuit court was reversed only in part, and that the case was remanded to that court for further proceedings in accordance with the opinion passed down in the circuit court of appeals. Another difficulty is that a portion of the opinion, at page 339, 18 C. C. A., page 867, 71 Fed., and page 209, 38 U. S. App., seems to lead up to a different conclusion from that which the court apparently reached. A careful scrutiny of what is there found leads, however, to the result that the court was only putting in their best form the propositions which the United States submitted. The conclusion is that found in the sentence at page 340, 18 C. C. A., page 868, 71 Fed., and page 210, 38 U. S. App., as follows:

"The evidence in the record indicates that, with the exception of the tubes, the mask, and the glass spools, the articles are scientific instruments, within the meaning of the statute, as we have interpreted it."

Out of lists of items, covering nearly four pages of the case as reported, those rejected by the court as subject to duty included only three of the most unimportant character; while the great mass, consisting almost entirely of instruments and utensils adapted for, and used specially, and perhaps solely, in practical surgery, was held exempt. The effect of the addition of the word "scientific" in the paragraph here under consideration to the word "philosophical" in the paragraph under consideration in Robertson v. Oelschlaeger is at once apparent on a comparison of some of the items making up the importations in the two cases. In Robertson v. Oelschlaeger, the items are given on pages 439, 440, 137 U. S., pages 148, 149, 11 Sup. Ct., and page 745, 34 L. Ed., and the disposition of them is found on page 440, 137 U. S., page 149, 11 Sup. Ct., and page 745, 34 L. Ed., with some further explanation in the following pages. The affirmation in that case of the ruling of the court below, directing a verdict for the collector with reference to the opthalmascope, the oculist's outfit, and the clinical thermometers, is sufficient to illustrate our proposition, because in U. S. v. Presbyterian Hospital 36 dozen of clinical thermometers and "Zeiss' optical apparatus in separate box" were held by the circuit court, as well as by the circuit court of appeals, to belong in the free list. Looking at the items on page 338, 18 C. C. A., page 867, 71 Fed., and pages 204, 205, 38 U. S. App. (U. S. v. Presbyterian Hospital), such ordinary surgical implements and utensils as spatulas, irrigators, flasks, test glasses, glass basins, cylindrical jars, test tubes, and brass holders for carrying rubber tubes, all of which we understand were held exempt, at once strike the eye. So far as U. S. v. Presbyterian Hospital is understandable from the reports, it is against the appellant. In that case the invoice consisted mainly of utensils, which are less suggestive of the word "scientific" than the instruments of which the importation in the appeal now before us was principally made up. Perhaps we might have held that U. S. v. Presbyterian Hospital is so clearly against the appellant as to have justified us in following it. without attempting any investigation of the statute on our own behalf.

The decree of the circuit court is affirmed.