UNITED STATES v. RHEINBOLDT (No. 1269).[1]

1. NEW YORK POST GRADUATE MEDICAL SCHOOL AND HOSPITAL.

This institution was established for the sole purpose of providing a post graduate course in medicine and surgery for practicing physicians. The hospital was established as an adjunct to the school, no cases being received for treatment except for purposes of instruction. The institution is an educational one.

2. OPTICAL INSTRUMENTS FOR USE IN THE HOSPITAL.

It being an educational institution, scientific instruments imported for use in the New York Post Graduate Medical School and Hospital were entitled to free entry under paragraph 650, tariff act of 1909.

[1] Reported in T. D. 35325 (28 Treas. Dec., 627).

## United States Court of Customs Appeals, April 14, 1915.

APPEAL from Board of United States General Appraisers, Abstract 33427 (T. D. 33 709).

[Affirmed.]

*Bert Hanson*, Assistant Attorney General (*Charles E. McNabb*, assistant attorney, of counsel), for the United States
*Taylor, Jackson & Brophy* for appellee.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The articles here in question were reported by the appraiser to be instruments such as are commonly used in hospitals; they were returned for duty by the appraiser as optical instruments under paragraph 108 of the tariff act of 1909. Acting upon this return, the collector assessed duty upon the merchandise at the rate of 45 per cent ad valorem as optical instruments under the paragraph just mentioned.

The importer protested against the assessment, claiming free entry for the merchandise under the terms of paragraph 650 of the act as scientific instruments and utensils specially imported in good faith for the use and by the order of an institution established solely for educational purposes.

The protest was duly submitted upon testimony to the Board of General Appraisers and the same was sustained by the board. From that decision the Government now prosecutes this appeal.

The following is a copy of paragraph 650 of the act of 1909:

650. Philosophical and scientific apparatus, utensils, instruments, and preparations, including bottles and boxes containing the same, specially imported in good faith for the use and by order of any society or institution incorporated or established solely for religious, philosophical, educational, scientific, or literary purposes, or for the encouragement of the fine arts, or for the use and by order of any college, academy, school, or seminary of learning in the United States, or any State or public library, and not for sale, subject to such regulations as the Secretary of the Treasury shall prescribe.

The sole question involved in the present case is whether the importation is entitled to free entry under the terms of the foregoing paragraph. If it is not, then the assessment concededly should be affirmed.

The invoices and the affidavits, as well as the oral testimony, are before the court. The proofs concerning the intrinsic character and use of the merchandise are very meager and unsatisfactory; nevertheless, they do not seem to require a reversal of the board's decision upon that account. United States *v.* Massachusetts General Hospital (100 Fed., 932); Sargent & Co. case (T. D. 24902). The record furthermore seems to show a formal compliance with the Treasury regulations for appropriate affidavits under the paragraph. But the question remains whether the institution for whose use

and upon whose order the articles were imported was an institution established solely for educational purposes, and this seems to be the real controversy between the parties. In his report of the assessment the collector says: "The articles in question consist of instruments commonly in use in hospitals, and from the affidavits lodged on entry were imported for institutions similar thereto." In view of the ruling in G. A. 5129 (T. D. 23693) and T. D. 24726 that hospitals are not established for any of the purposes mentioned in the paragraph (650) under which entry is claimed, this office affirms the assessment of duty as made at 45 per cent under paragraph 108 as optical instruments. Note T. D. 30525 and T. D. 31861.

The institution thus called into question is one established and maintained by a corporation organized under the laws of the State of New York bearing the name of the "New York Post Graduate Medical School and Hospital." The object of the corporation, as stated in its charter, is "the establishment of a school for the further instruction of persons already possessing the degree of doctor in medicine, and a hospital for the treatment of diseased and injured persons in the city and county of New York." The history of the institution as established and conducted by the corporation is set out in the testimony of Dr. Chace, who was one of its founders and is now its secretary, and is as follows:

Q. Will you please state briefly the character of the New York Post Graduate Medical School and Hospital, stating what is carried on there, and how it is carried on?—A. It is an institution founded for the teaching of graduates in medicine, for practicing physicians. It was founded in 1882 by five professors from the University of the State of New York—I mean University of New York State; New York State University Medical School. These five professors founded this school for teaching doctors—at that time the first school in this country. Then, in teaching doctors, it was absolutely essential to have cases, and they immediately had to bring cases in to teach. At first they brought them in from their offices. Later on they had a few beds used for teaching. These beds have gradually increased until at the present time we have a hospital for teaching purposes.

Q. At the present time, as I understand it, the school is chiefly a clinical school?—A. Practically entirely so, inasmuch as it is for doctors.

Q. As distinguished from didactic teaching?—A. Yes, sir.

Q. Is it a fact that patients are taken in in accordance with their teaching value to a certain extent?—A. Entirely so.

Q. And those are the patients which are, so to speak, in the hospital department of the institution?—A. Yes, sir.

Q. What difference, if any, can you of your own knowledge state with respect to the teaching done in the post graduate and teaching as done at other hospitals?—A. In the post graduate it is a difference in the primary object. In the post graduate every case that comes into the hospital is used for teaching purposes, and the number of cases that come in depend on the demand for teaching on that subject. For example, a man in the eye diseases has 3 cases assigned to him. In medicine we have 49 cases. Every case is used for teaching. In surgery they have 35 cases, but the number of cases depends entirely on the teaching demands in that department. We have at present 800 doctors coming from all over the world to study and we change

the relative number of patients assigned to each department, depending upon the demand for teaching in that department.

Q. How many doctors registered for study in various courses at the post graduate last season?—A. It is within one or two of 800; it might be 801 or 799.

Q. The post graduate is a University of the State of New York?—A. It is a Department of the University of the State of New York.

Q. And its only source of income is gifts and the income from gifts, is that correct?—A. Yes, sir; and the fees from the doctors.

Q. From tuition?—A. Yes, sir; from doctors.

Q. (By Mr. DOHERTY.) Where is this institution located?—A. 303 East Twentieth Street.

Q. Where do you get the medical cases from?—A. They apply there for admission to the dispensary, largely from the reputation of the school and hospital.

· Q. Then your activities consist of lectures and clinical exhibitions, I présume, and the hospital and the dispensary also?—A. Teaching. I would like to put that a little bit differently.

Q. Put it your own way.—A. I would say that we have a school for doctors, which is the primary object, and then in order to conduct a school, it is absolutely essential—a school for practicing physicians, for practitioners—it is absolutely essential to have cases for them to study upon. In order to have cases we have beds; in order to—a few patients too sick to be ambulatory cases, and down in the basement we have rooms for patients who come and go to the hospital—for teaching.

Q. You have a dispensary there, also, have you?—A. We have a dispensary solely for teaching. Every case that comes to the hospital is used for teaching purposes.

Q. Do you make any charge to the patients in the hospital?—A. Under the State laws of New York we are obliged to charge 10 cents for every case coming into the dispensary.

Q. That is for medicine?—A. No, not for medicine; it is—as I understand, it is a State law.

Q. Ten cents for medicine. In the hospital proper do the patients have to pay anything?—A. Seventy-five per cent of our cases are absolutely free, according to our statistics of last year; that is about an average since we founded. The other 25 per cent pay for board, not for treatment.

Q. And do you have for some of them separate rooms for patients?—A. The hospital for teaching is divided up. The ear department would have a room of four or five beds; the eye diseases would have another room of four or five beds. The hospital is divided up more according to the specialty the teaching demands.

Q. Do you have any private rooms at all for any individual patients?—A. We have 48 private rooms.

Q. And they pay for those accommodations, do they not?—A. They pay for those accommodations.

The foregoing testimony is not contradicted or opposed in any manner. It appears therefrom that the institution in question was established as a department of a university for the sole purpose of providing a post graduate course in medicine and surgery for practicing physicians. The school now has about 800 such students. In order properly to teach the necessary branches in medicine and surgery, it was necessary to obtain clinical cases for purposes of demonstration. A certain number of such cases would be required for each course of study. In order to meet this requirement the so-called hospital was established as an adjunct of the school, not for the purpose of receiving and treating sick or wounded patients as such,

either for pay or charity, but solely for the purpose of obtaining clinical cases for use in the fixed courses of instruction in the school. By this means special cases of the right kind and number could be had at the right time to facilitate the work of instruction. No other cases were received. No charge was made for medical or surgical services except a nominal charge of 10 cents per patient, which seems to be a technical requirement of the State statutes and has no bearing upon the question in hand. In a minority of the cases the patients paid for boarding and lodging; in most of the cases they did not.

The foregoing circumstances seem to establish the fact that the institution in question, including the so-called hospital, was established and conducted solely as an educational institution, notwithstanding the fact that the word "hospital" appears in the name of the corporation. It was not, in fact, an institution established in whole or in part for the purpose of receiving and treating sick or wounded patients as such, but it simply made use of certain sick or wounded patients as a means of instruction in the fixed routine of the school. Such a school could not be conducted without a certain number of clinical cases, and the mere fact that the necessary cases for this purpose were received immediately under the roof of the institution did not convert it into a hospital in the common signification of that term. The institution in its entirety, nevertheless, remained an educational institution only. It is doubtless true that such patients were compelled to spend some time at the institution in preparing for and recovering from operations, but this also was within the sphere of the school's teaching and a part of the education of a physician or surgeon.

The present case therefore differs in principle from that of an ordidary hospital where patients are treated as such, and where the purpose is to receive and treat sick and wounded persons in general. It has been held in well-considered cases that hospitals as such are not institutions established solely for educational purposes within the meaning of paragraph 650, *supra*, even although incidentally some instruction in nursing or medicine is given therein. Bushnell case (T. D. 18708), Treasury instructions (T. D. 18767), Massachusetts General Hospital *v.* United States (112 Fed., 670, 672), John L. Godley case (T. D. 23693), Treasury regulations (T. D. 24726 and T. D. 28273). But these cases refer to institutions which are hospitals in fact within the common acceptation of that term, whereas the institution now in question is not a hospital in that sense even though it nominally bears that title.

There is another question which may be briefly mentioned. The provisions of paragraph 650, *supra*, are made to apply to institutions *incorporated* or established solely for educational purposes. The

institution now in question is incorporated and is authorized by charter to establish "a school for the further instruction of persons already possessing the degree of doctor of medicine, and a hospital for the treatment of diseased and injured persons in the city and county of New York." In view of the foregoing language of the charter, whereby the corporation might establish a hospital as well as a school, it may be argued that it was not incorporated solely for educational purposes, and therefore could not come within the language of the paragraph. The paragraph, however, in terms also covers such institutions as are *established* solely for educational purposes. And as already stated this was the real character of the only institution which was actually established by the corporation. Under the provisions of paragraph 650, *supra,* it seems that the actual character of the institution as established and conducted should be decisive of its rights under the paragraph rather than the legal capacity of the corporation by which it was established. For example, an institution established by an individual or by an unincorporated society would enjoy the rights granted by paragraph 650, *supra,* if such institution were in fact established and conducted for educational purposes only, notwithstanding the fact that the founders in such case would possess also the legal capacity to establish a general hospital without any educational features whatever connected therewith. It seems to be more consistent with the legislative intent manifested in the paragraph in question to hold that the rights of an institution under that paragraph should be determined by its actual character and conduct rather than by the legal capacity of its founders.

This view finds expression in the decision of the Circuit Court of Appeals, First Circuit, in the case of United States *v.* Massachusetts General Hospital (100 Fed., 932–935), where Judge Putnam, speaking for the court, says:

We think, however, that the decisions to which we have referred afford sufficient acquiescence on one proposition now made by the United States to enable us to dispose of it favorably to the importer. The United States claim that, even if the Massachusetts General Hospital has any educational phase, this is not sufficient unless there is some law of the corporation's existence specifically recognizing it. This is too technical, because a statutory enactment of the character of the paragraph in issue here has a generous purpose which can not recognize such refined distinctions.

It may be noted that a change in the language of the statutes has made the foregoing case now inapplicable as an authority upon the main question decided by it, but the value of the observation just quoted remains unaffected by that change.

In accordance with the foregoing views the decision of the board is *affirmed.*

BARBER, Judge: I understand there is no error as to the classification of the merchandise, and, so understanding, concur.