UNITED STATES v. KASTOR & BROS. (No. 1254).[1]

1. PARAGRAPH 650, TARIFF ACT OF 1909.

The history of this paragraph shows a purpose to regard less the character of the article imported than its intended use. The object was to admit the articles described free of duty when imported by designated institutions in the furtherance of education.

2. SCIENTIFIC APPARATUS FOR EDUCATIONAL USES.

A review of the decisions makes clear that in fixing the dutiable or nondutiable status of articles imported by institutions to further educational objects regard should be had not so much to intrinsic character or to use in chief but rather to the actual use for which the particular goods were in fact brought in. This judicial interpretation stands approved by subsequent congressional enactments. The scissors of the importation, marked "Board of Education," and destined to be used in the teaching of sewing in New York City schools, were entitled to free entry under paragraph 650.

---

[1] Reported in T. D. 35323 (28 Treas. Dec., 613).

United States Court of Customs Appeals, April 14, 1915.

APPEAL from Board of United States General Appraisers, Abstract 33236 (T. D. 33668).

[Affirmed.]

*Bert Hanson* Assistant Attorney General (*Charles E. McNabb* assistant attorney, on the brief), for the United States.

*B. A. Levett* for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

The importation was one of scissors by the Board of Education of New York City admittedly for use in teaching sewing in the schools of that city. There is nothing distinctive in their construction from the scissors of a kind commonly bought and sold in trade and commerce for household and industrial uses save that they have stenciled on one blade the words "Board of Education." The collector of customs at the port of New York assessed them for dutiable purposes under an *eo nomine* provision of paragraph 152 of the tariff act of 1909 as "scissors." The protestant, who is the appellee here, protested upon the ground that the merchandise was entitled to free entry under the provisions of paragraph 650 of that act, which paragraph reads:

650. Philosophical and scientific apparatus, utensils, instruments, and preparations, including bottles and boxes containing the same, specially imported in good faith for the use and by order of any society or institution incorporated or established solely for religious, philosophical, educational, scientific, or literary purposes, or for the encouragement of the fine arts, or for the use and by order of any college, academy, school, or seminary of learning in the United States, or any State or public library, and not for sale, subject to such regulations as the Secretary of the Treasury shall prescribe.

The Board of General Appraisers sustained the protest and the Government appeals. It is admitted that the merchandise was imported by said board for the uses stated, and that all of the requirements of the Secretary of the Treasury promulgated under paragraph 650 have been duly satisfied. The question for decision, therefore, stands, is such merchandise imported under those circumstances within the provisions of the paragraph quoted.

This paragraph dates its ancestry back to one of the first tariff laws of the Government, the act of August 10, 1790. It has remained in substance, though varied and extended, a provision of our tariff laws down to and including the existing law. No other provision of tariff enactment has been the subject of more serious or profound consideration in the ascertainment of its legal interpretation. An extended review of the various provisions of law upon the subject and the decisions discussing the same may be found in a carefully considered and instructive opinion by the Board of General Appraisers in the case of E. H. Sargent & Co., G. A. 5532 (T. D. 24902).

Another thoughtful discussion of the subject is had by the United States Circuit Court of Appeals, First Circuit, in the case of United States v. Massachusetts General Hospital (100 Fed., 932).

It may be briefly said that the legislative history of the paragraph indicates unquestionably a purpose in Congress on the one hand to enlarge the class of articles admitted free of duty under this paragraph, while on the other hand the class of individuals and institutions granted the benefit thereof is more expressly defined, if not limited, by the language of Congress and the conditions of importation multiplied. The two subjects embraced in the same paragraph, each being gradually developed and extended over a period of more than 100 years, would seem to incontrovertibly indicate the purpose of Congress to, in a diminishing degree at least, regard the character of the article imported, while it emphasized and more closely defined the character of the institutions which were to receive the benefit of these importations and the conditions of such grant. And, since these objects are solely devoted to the cause of education and science, the purpose of Congress is easily understood and accepted, and is in harmony with many other similar provisions of our tariff laws. The legislative purpose as a guide in construction is thus made obvious. It is in furtherance of education.

The history of the progress of this legislation is precisely set forth in the two opinions cited, and for that reason will not here be reviewed.

The three competing rules of construction applicable to the paragraph which might be adopted by the tribunal construing the same were and are as follows: First, the intrinsic character of the article itself; second, the chief use of the article generally in the trade and commerce of the United States; third, the actual use for which the particular article was in fact imported.

The issue squarely before this court for determination is which of these *rules* of decision is the correct one in the present status of the law.

Confessedly, the paramount duty of the court in such cases is, the statute under well-settled canons of construction permitting, to decree a uniform *rule* of action and not rest enforcement of the act in the caprice or judgment of a hundred or more different minds at as many different ports of the country and as to a multitude of different articles. By the former uniformity of burdens and uniformity of benefits are established. By the latter the exact converse. The test here contended for by the Government is the first, that of intrinsic character with all its consequent fallibilities. Careful research and analysis fail to disclose that in the course of more than a hundred years of adjudication of this law any court of considerable authority save one—United States v. Presbyterian Hospital (71 Fed., 866)—has

essayed to approve this test, and the reasoning of that decision was obviously predicated upon a misinterpretation of Robertson *v.* Oelschlaeger (137 U. S., 436). Of this decision Judge Colt, in *In re* Massachusetts General Hospital (95 Fed., 973–975), well said:

This rule of interpretation [intrinsic quality] is seemingly in conflict with Robertson *v.* Oelschlaeger, where the Supreme Court adopted the rule of "principal use," rather than "intrinsic character," with respect to philosophical instruments.

And on appeal this decision was affirmed, the Circuit Court of Appeals for the First Circuit, in United States *v.* Massachusetts General Hospital (100 Fed., 932–939), significantly pointing out that, notwithstanding the language of the Circuit Court of Appeals for the Second Circuit in United States *v.* Presbyterian Hospital case, nevertheless the court decided that "such ordinary surgical implements and utensils as spatulas, irrigators, flasks, test glasses, glass basins, cylindrical jars, test tubes, and brass holders for carrying rubber tubes," were exempt, and "at once strikes the eye." Aside from the declarations, which, as stated by Judge Colt, are in conflict with the decision of the Supreme Court in Robertson *v.* Oelschlaeger, the decree seems to have accorded with that decision.

Perhaps no decision has been oftener quoted on this subject than that of Robertson *v.* Oelschlaeger, *supra.* But while the court employed the language, "philosophical apparatus and instruments * * * are such as are more commonly used for the purpose of making observations and discoveries in nature, and experiments for developing and exhibiting natural forces, and the conditions under which they can be called into activity," *it did not employ that language as a definition of the per se requirements of articles within the statute.* On the contrary, the court there prescribed a rule of evidence within which articles must be shown to be included in order to be held and admitted free of duty as "*philosophical* apparatus and instruments." The court there defined the *use* to which these apparatus and instruments must be shown to be designed and devoted to *by evidence* in order to come within the act, and did not essay a definition of intrinsic character which they must possess. The decision so demonstrates. There were 44 kinds of instruments in question. Evidence was introduced solely as to their *uses.* The court below considered this evidence, exercised its judicial knowledge, *and* considered the articles themselves. The opinion of the court shows that the Supreme Court considered that the *intrinsic character* of 18 of the instruments *was proof enough of their philosophical use,* that the intrinsic character of 20 of the instruments was proof enough of their nonphilosophical use and approved such direction of a verdict; but that as to 6 of the articles *their intrinsic character did not show* satisfactorily their use, and that question was therefore submitted to the jury, whose verdict, based upon evidence-*aliunde* that 3 thereof were philosophical instruments.

because of their proven use, was upheld by the court. So that the often made claim that this decision is a definition of or authority for the test of intrinsic character under this provision of law is without any foundation. On the contrary, it establishes a rule of evidence and is an authority for the rule of chief use.

Be it noted that in accordance therewith the Supreme Court in that case approved a finding that single-barreled field glasses and ordinary double-barreled field glasses used in everyday life to gratify curiosity and sometimes by mariners, and magic lanterns used *in the illustration of natural science* were philosophical instruments within the statute. While this decision of the first court held that chief use and not intrinsic character was the test, be it remembered that the statute there considered read only "philosophical apparatus and instruments, thirty-five per centum ad valorem." Since then the words "scientific," "utensils," and "preparations" have been added, *and* it is further enacted that such articles are to be conditionally free when "specially imported in good faith *for the use* and by order of *any* society or institution incorporated or established solely for religious, philosophical, educational, scientific, or literary purposes," etc.

So that whether we consider the express words of the act, making "use" the test or the adjective force of the words "philosophical and scientific" therein, *use*, and not intrinsic character, by the highest and all authorities, not discredited, is the test imposed by Congress. This conclusion brings us to a uniform *rule* of decision resting its susceptibility to certainty in all cases upon tangible proof. That proof may and often does satisfactorily reside in the intrinsic character of the instrument itself, which may satisfactorily show its intended and sole use, but that proof is not exclusive. *Proof* may, as in the Robertson *v.* Oelschlaeger case, be offered *aliunde* to show the uses of the importation.

As pointed out by this court in United States *v.* Wyman & Co. (2 Ct. Cust. Appls., 440; T. D. 32200), that construction continued to be the accepted one until the decision of the United States Circuit Court of Appeals for the Second Circuit in United States *v.* Presbyterian Hospital (71 Fed., 866). In that case, as we have seen, the court seemingly in its opinion approved as the rule of construction the first rule stated, that of intrinsic character, but in its decree seems not to have gone so far. Later the Court of Appeals for the First Circuit, in United States *v.* Massachusetts General Hospital (100 Fed., 932), seems to have adhered to the rule of chief use in the trade and commerce generally of the country previously adopted by the Supreme Court of the United States. This decision was rendered in 1900.

Thereafter, in 1904, the act having been amended when and as stated the Board of General Appraisers rendered the decision in the

case of E. H. Sargent & Co., G. A. 5532 (T. D. 24902). This decision carefully reviews the legislative and judicial history of the paragraph, and, concluding that the controlling rule of decision should be the obvious purpose of Congress to favor all kinds of education, prescribes three principles of decision to determine whether or not imported articles are entitled to free entry under this paragraph. The board said:

In the view we take of it, *it matters not that these articles are not essentially scientific in their character, nor yet what is their chief use.* The questions are: (1) Are they imported in good faith by order and for the use of one of the institutions named in the law and not for sale? (2) Are they intended to be used in philosophical or scientific investigation, research, demonstration, or instruction? (3) Do they serve a useful purpose and are they necessary and especially appropriate in such investigation, research, demonstration, or instruction? (Italics ours.)

Importance is given this decision because it subsequently formed the basis of legislative adoption. It should be emphasized in that connection that it *expressly* repudiates the test of intrinsic character and the rule of chief use. What rule remains? If this doctrine has received legislative approval, and therein both the test of intrinsic character and the rule of chief use are expressly repudiated, this court has naught to do but adopt the sole and only remaining rule or test, to wit, actual use. Here we are at least afforded a tangible rule of guidance and ascertainment rather than resting the matter in the necessarily varied opinions of numerous appraising officers.

It will be noticed that the tests prescribed by the board do not license a general literal application of the third rule of construction stated, but limit it to the extent that the article must be such as serves a useful purpose, and is necessary and especially appropriate in philosophical or scientific investigation, research, demonstration, or instruction. It will be observed, as thus limited, it is not every article that would be imported, for example, by the Board of Education of New York which would be entitled to free entry, but only those are so entitled which actually are to be used in and are especially appropriate for or adapted to facilitate investigation, research, demonstration, and instruction in the philosophic and scientific subjects of education under the jurisdiction of that board. Of course, the more commercial the education the more ordinary will be the imported utensil, etc. Necessarily, as we approach educationally the every-day employments, we correspondingly touch the more commonplace utensils, instruments, and apparatus appropriate for instruction and demonstration therein. This limitation, however, would exclude all articles, indeed all similar articles, used in and for the every-day conveniences and necessities of daily comfort, routine, or business, and not especially appropriate to and immediately used in demonstration or instruction in some particular branch of philosophic or scientific education. The limitation answers the question of the Government

counsel in his brief at page 11, wherein the inquiry is made, "If scissors of the kind commonly used in the household and in mechanical trades may be imported by schools for instruction in sewing, may not dish pans, garbage pails, and other utensils used in teaching cooking and housework also be?" The answer would be yes if duly imported for, especially appropriate in the teaching of domestic science, and to be actually so used. If it be true that domestic science is taught by the Board of Education of New York and the culinary branch thereof the subject of demonstration and instruction, so as to render such articles especially appropriate in the necessary investigations, research, demonstration, and instruction of that science, we can conceive of no reason why such educational institutions or an institution teaching such should not also receive the benefit of this grant of Congress, the results of which would be widespread and peculiarly advantageous in every home. Certainly this congressional purpose requires that such aid should be given as well as in the higher sciences, arts, and philosophical investigations, open only to a much more limited class of people.

If we accept as the test of the construction of this paragraph that which serves to aid in scientific education, we can not restrict its application to the higher classes of that education and deny it to the more commonplace, for each is equally within the language of the statute.

Indeed, when we contemplate the statutory objects of this grant, as enumerated by Congress, including not alone societies and institutions incorporated or established for religious, philosophical, scientific, and literary purposes, but "any" such established for "educational" purposes, as well as "any" college, academy, school, or seminary of learning in the United States, we are led to suspect that for many of this extensive and expressly named category of beneficiaries, including every elementary educational establishment of the land, in many of which no doubt intrinsically philosophic and scientific apparatus are probably unknown and unseen, Congress intended to provide for these equally free of duty all such "utensils" as within the statutory conditions were especially appropriate to enlightenment in their more humble studies.

Nor does this construction deny the words "philosophical and scientific" any force in the act. Grammatical as well as judicial construction has always assigned or admitted them assignable to the office of determining the use in which these apparatus, utensils, preparations, and instruments must be generally or are actually employed. This construction maintains that limitation, but extends that use in obedience to the obvious will of Congress expressed in a constantly enlarged scope of statutory language.

What may or may not constitute a scientific use as contemplated by Congress in this enactment receives some light from the history

and the words of the legislation. Science as exactly defined in modern usage and as given in substance by the modern lexicographers is substantially—

Knowledge gained and verified by exact observation and correct thinking, especially as methodically formulated and arranged in a rational system.

Earlier definitions of the term confined it to the more limited scope of the seven liberal arts—arithmetic, grammar, rhetoric, logic, music, geometry, and astronomy. The Standard Dictionary, for example, defines it as:

2. *Any* department of knowledge in which the results of investigation have been worked out and systematized;

And

4. Expertness or ability to do, resulting from knowledge; exceptional skill acquired by intelligent practice.

This definition is not exceptional. In substance, if not in words, it was quoted and approved in 1899 in *In re* Massachusetts General Hospital (95 Fed., 973–976), *supra*, which case was affirmed in United States *v.* Massachusetts General Hospital (100 Fed., 932), *supra*, and applied to this paragraph of tariff law, since which time Congress has twice, in 1909 and 1913, reenacted the paragraph without change of these words, wherefore it has become more a judicial and legislative than a lexicographic definition, and, therefore, is of peculiarly appropriate legal force as here adopted and applied.

Within this field, of recent years, there has been and now is a rapidly developing branch of educational systems wherein the principles and rules of domestic accomplishments are investigated, systematized, and practiced, whereby greater expertness and exceptional skill are required, commonly known as "domestic science." Common knowledge advises us that many schools and colleges are partly or exclusively devoted to such instruction and education. It has become an important and conspicuous branch of our educational systems.

The words of Congress in this paragraph as to "utensils" and "preparations" to be used by any "academy, school, or seminary of learning" seem more nearly appropriate in contemplation and aid of such learning than of astronomy, music, and other of the higher sciences. The legislative and judicial history of the paragraph seem to us to indicate the purpose of Congress to aid without discrimination "any department of knowledge in which the results of investigation have been worked out and systematized," relying upon the limitations in the paragraph itself and the regulations expressly therein confided to the power of the Secretary of the Treasury to protect against fraud and abuse.

Moreover, the decision of the board announcing the stated requirements as to free importation of this class of articles, G. A. 5532 (T. D.

24902), announced in 1904, was not appealed from by the Government, the paragraph therein construed was expressly reenacted *in hæc verba* as paragraph 650 of the tariff act of 1909, said decision was expressly cited as the correct rule of decision by the Treasury Department regulations in 1912 (T. D. 32289), and, we may add, was again approved by Congress reenacting the pertinent provision in the same words as paragraph 573 of the tariff act of 1913.

And, if we may measure this creed by empiric test in an effort to harmonize the results here following with those of earlier decisions, what intrinsically philosophic or scientific points of difference are inherently manifested between the steel scissors marked "Board of Education" in this case and the "flasks," "cylindrical jars," and "brass holders for carrying rubber tubes" in United States *v.* Presbyterian Hospital (71 Fed., 866; see 100 Fed., at p. 939), or the ordinary "double-barreled field glasses" and "barometers" and "magic lanterns" in Robertson *v.* Oelschlaeger (137 U. S., 436–439), or the "porcelain casseroles," "glass funnels," and "porcelain dishes" in Sargent's case, G. A. 5532 (T. D. 24902), acquiesced in by the Treasury Department in T. D. 32289. By all the signs of mechanism within the radius of our perhaps limited experience we can in none of those instances perceive an intrinsic quality bespeaking a philosophic or scientific quest.

In conclusion, it may well be reiterated that Congress has legislatively approved a repudiation of both the test of intrinsic character and rule of chief use. Consequently the sole remaining rule open to the court for adoption is that of *actual* use. In the interest of uniformity of customs administration and equality of burdens and benefits any *rule* that secures such is preferable to administration by individual caprice or judgment.

This court, in the case of United States *v.* Wyman & Co. (2 Ct. Cust. Appls., 440; T. D. 32200), speaking through the presiding judge, in harmony with this conclusion, after reviewing the decisions of the courts and the natural scope of the words as used by Congress, said:

These definitions are clearly broad enough to include any collection of things employed as a means to the end of scientific instruction. * * *.

In view of the foregoing the decision of the Board of General Appraisers is *affirmed.*

_____

### DISSENTING OPINION.

BARBER, Judge: I feel constrained to dissent from the majority opinion of the court in this case.

The merchandise is scissors—just common, ordinary scissors—upon the blades of which were etched the words "Board of Education"; in

other respects they are not different from the scissors in common, ordinary, everyday use by a majority of people. They were assessed for duty under paragraph 152 of the act of 1909, the material part of which is as follows:

152. * * * Scissors and shears and blades for the same, finished or unfinished * * *.

They are claimed by the importers to be entitled to free entry under paragraph 650, set forth in the main opinion, and the board so held.

The assignment of errors alleges, among other things, that the board erred "in not affirming the assessment of duty herein."

In its brief the Government argues the question of whether the merchandise is dutiable under paragraph 650, contenting itself upon the question as to whether the scissors are *eo nomine* provided for under paragraph 152, with the statement that the assessment was under such *eo nomine* provision.

The importers do not brief the case further than to say that the decision rests upon the authority of T. D. 24902, referred to in the majority opinion, to which Treasury decision reference is made for the argument. Importers also claim that decision has since been uniformly followed by the board and indorsed by this court in United States *v.* Wyman (2 Ct. Cust. Appls., 440; T. D. 32200).

The opinion of the Board of General Appraisers in the case at bar is so short that I quote all thereof that is material:

According to the testimony and the appraiser's notation upon the invoice, each pair of scissors had stamped upon it "Board of Education," and the testimony states that the scissors are for the use of the Board of Education of New York City in teaching sewing in the public schools of that city. * * * The regulations of the Secretary of the Treasury have been complied with. * * *

The board then referred to said T. D. 24902 apparently as authority for sustaining the protest. There was no finding that these scissors were philosophical or scientific instruments, no finding that the teaching of sewing was in any sense a science, and no allusion whatever to the fact that the scissors were *eo nomine* within the provision of paragraph 152.

For convenience I quote all the evidence showing the use made of these scissors:

Q. Do you know to what use these scissors are put?—A. They are sent to the different schools for the sewing classes, and use some in domestic science.

Q. Used for any other purpose except that?—A. No, sir.

Q. That is, to teach children how to sew?—A. Yes, sir.

Omitting for the present any consideration of whether these scissors are philosophical or scientific instruments within paragraph 650, I think this case should be disposed of upon the familiar and well settled rule that the designation of an article *eo nomine* for duty, or as exempt from duty, must prevail over words of general descrip-

tion which might otherwise include an article specially designated. Chew Hing Lung *v.* Wise (176 U. S., 156).

To such rule this court has necessarily and properly committed itself and has adhered thereto.

In Goussios *v.* United States (2 Ct. Cust. Appls., 317; T. D. 32051) the rule was applied in favor of the term "olives" in various named containers and packages in a dutiable paragraph in competition with the provision for fruits or berries, green, ripe, or dried, or fruits in brine in a free-entry paragraph. See also United States *v.* Haaker (4 Ct. Cust. Appls., 471; T. D. 33884). And there are many others of like import.

I think that rule is applicable here.

Scissors are *eo nomine* provided for in paragraph 152. Paragraph 650 makes no *eo nomine* provision other than as found in the words "philosophical and scientific apparatus, utensils, instruments, and preparations, including bottles and boxes containing the same." In other words it names a class, all of which must be either philosophical or scientific and in which scissors are not named, while paragraph 152 specifically names scissors. The case closely resembles Chew Hing Lung *v.* Wise, *supra.*

I think upon this ground alone the action of the collector should have been upheld and that this court should reverse the board

The majority opinion, however, places its decision upon an assumed rule suggested in substance by the board in T. D. 24902, "that the actual use for which the article was in fact imported" is the proper test. This rule is then said to go so far as to permit in certain cases the assessment, as philosophical or scientific instruments, of dish pans and garbage pails, and other utensils used in teaching cooking and housework. It is also held that there has been a Congressional and administrative adoption of this rule.

I feel constrained to briefly state a few of the many reasons why I can not concur therein.

The board did not unqualifiedly adopt the rule above stated in T. D. 24902. It said in that case:

It is not intended that this should comprehend those articles of ordinary furniture and equipment which are used not only in schools and colleges but in offices and business houses as well, but only such as are especially appropriate in philosophical or scientific investigation, research, demonstration, or instruction.

I do not think it can be demonstrated that these scissors are *especially* appropriate within the meaning of the above-quoted language. The obvious use to be made of them is to cut patterns or cloth or cut off threads. I doubt if the record shows they are used for any purpose within the meaning of paragraph 650.

The statement that the rules laid down by the board were adopted by the Government must be taken with a grain of allowance.

The adoption was in this wise: The rules of the board were quoted. It was said that since their promulgation the board had held that weaving looms, a four-wheeled searchlight tower, drafting tables, furniture, and similar articles, though imported by educational institutions, were not within the paragraph. The interpretation placed upon the board's decision was then set forth in the language hereafter quoted, which clearly shows the extent of its adoption. It was said:

While it may be true that the power drill is intended for use in educational work and instruction, it is of the same status as a plow or other farm implement when imported by an agricultural college, machinery when imported by a textile school, or typewriters, calculating machines, etc., when imported by a business college. While such articles may be useful and necessary for the purposes of instruction in such schools, so also are desks, chairs, and similar articles, which, while used for educational purposes, are not necessary or especially appropriate for scientific or philosophical investigation, research, demonstration, or instruction. (T. D. 32289.)

Until the present case, so far as I am advised, the board has never understood its rules of construction to cover scissors or like articles. It has held lead pencils, pens, and other articles of like nature were not philosophical or scientific apparatus, utensils, or instruments. Abstract 24898 (T. D. 31335), decided February 21, 1911, which is, of course, a date later than T. D. 24902.

No court has sustained the rules suggested by the board. The Treasury Department has not adopted them in the sense of the majority opinion. How it can be said, in view of this, that Congress by reenacting the paragraph has approved the construction adopted by the court is more than I can understand. Thereby the words "philosopical and scientific" are really construed *out* of it, while Congress has uniformly kept them there, obviously for *some* purpose.

That Congress has supposed the term "philosophical and scientific" had a meaning when used in a similar connection is demonstrated by the fact that in paragraph 714 of the act of 1909 the term "philosophical and scientific apparatus" is used to describe merchandise that under certain circumstances is entitled to free entry. This term has been employed in like connection and manner as far back as 1890 and is so used in paragraph 653 of the act of 1913.

Language is to be construed in the light of the common understanding as to its meaning, unless a different commercial designation be shown, which is not here.

The *result* of the majority opinion is that scissors are philosophical or scientific instruments within the meaning of paragraph 650. I do not hesitate to say that in common understanding the language there employed does not warrant that result.

Use is not made the first test by the paragraph. If the articles are within the language employed to describe them, that is, if they are philosophical or scientific (and are not *eo nomine* elsewhere provided

for), then, if it is shown they are to be devoted to the statutory uses they are entitled under regulations to be prescribed by the Secretary of the Treasury to free entry.

I think it is both unnecessary and inadvisable to attempt to establish any set of rules for classification of merchandise under paragraph 650. Whether an instrument is philosophical or scientific may well be left for conclusion upon the facts in each particular case and the determination may require evidence, as was held by the Supreme Court in the Oelschlaeger case, referred to in the main opinion. Some instruments may be determined to be philosophical or scientific upon an inspection thereof; others, such as the common simple tools, implements, and utensils in everyday use by large numbers of people, the principle of whose operation is commonly understood, may well, of judicial cognizance, be said not to be either philosophical or scientific, while as to the class between "sufficient unto the day is the evil thereof."

In United States v. Presbyterian Hospital (71 Fed., 866) the Circuit Court of Appeals held that the term "scientific instrument" suggested "something other than a mere mechanical tool or appliance, however peculiarly adapted to use it may be in scientific labors."

In the Circuit Court (see In re Massachusetts General Hospital, 95 Fed., 973), among other things, it was said:

An ordinary knife is a mechanical instrument, because its principal use is in the trades and arts, while a surgeon's knife, especially designed for surgery, and principally used for such purpose, is a scientific instrument.

I am unable to see wherein the case of United States v. Wyman (2 Ct. Cust. Appls., 440; T. D. 32200) is at variance with the conclusion I reach in this case. The merchandise there was an iron cylinder containing liquid sulphurous acid' which maintained the liquid form only when under tremendous pressure and became gas when the pressure was removed. The acid was used for scientific purposes and the iron cylinder or some other similar container was indispensable. The contents of the cylinder were sufficient to last the University of Kansas, for which it was imported, for several years. The liquid acid could not be transferred to another container without difficulty and its sudden release might cause an explosion. Under these circumstances it was held that the container and its contents were scientific apparatus within the meaning of the paragraph.

It is, however, an altogether different thing to say that common scissors are a scientific or philosophical instrument. The term *apparatus* does not fit such scissors, and the word "scientific" is wholly inapplicable thereto.

I would reverse the judgment of the Board of General Appraisers.