O. G. Hempstead & Son *v.* United States (No. 3120)[1]

United States Court of Customs Appeals, January 9, 1929

*Comstock & Washburn (J. Stuart Tompkins* of counsel) for appellant.
*Charles D. Lawrence,* Assistant Attorney General (*Fred J. Carter,* special attorney, of counsel), for the United States.
*Lamb & Lerch (John G. Lerch* of counsel), amici curiæ.

[Oral argument December 4, 1928, by Mr. Tompkins, Mr. Lawrence, and Mr. Lerch]

Before Graham, Presiding Judge, and Bland, Hatfield, and Barber (retired), Associate Judges

Graham, Presiding Judge, delivered the opinion of the court:

O. G. Hempstead & Son imported certain articles at the port of Philadelphia, entered variously as "chemical glassware" and "scientific glassware." The samples introduced in evidence show the merchandise to be of six kinds, namely: First, Exhibit A. Spirit hydrometers, with proof and Tralle scales, which hydrometers are used to determine the alcoholic content in distilled liquor. Second, Exhibit B. Similar spirit hydrometers equipped with thermometers for guidance in testing, and lettered "U. S. Customs House hydrometer for spirit." Third, Exhibit C. Hydrometers used in testing the specific gravity of malt beverages. Fourth, Exhibit D. Storage-battery testers. Fifth, Exhibit E. Hydrometers similar to the first class, but larger, and used for the same purpose. Sixth, Exhibit F. Baumé's hydrometers, used for determining the specific gravity of liquids. All of these are in chief value of glass and are blown. They are all constructed along similar lines and each consists of a weighted lower end, surmounted by an elongated, circular, glass bulb, which in turn is surmounted by a smaller glass tube containing a printed scale

---

[1] T. D. 43173.

or scales, according to its variety, each being securely sealed, by blowing, at both ends.

The collector classified the merchandise as scientific glassware under paragraph 218 of the Tariff Act of 1922 at 65 per centum ad valorem.

The importer protested. Various claims were made in the protests, but as but two of them are relied upon in this court, these will be the only claims noticed, namely, that the goods were dutiable, first, at 55 per centum ad valorem as "all articles of every description not specially provided for, composed wholly or in chief value of glass or paste, or combinations of glass and paste, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched * * *," under said paragraph 218, and, second, at 50 per centum ad valorem under paragraph 230 of said act, as manufactures of glass or paste or of which glass or paste is the component material of chief value, not specially provided for. The Customs Court overruled the protests and importer has appealed.

The debated portions of said paragraph 218 are as follows:

PAR. 218. Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, utensils, tubing, and rods, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, all of the foregoing, finished or unfinished, composed wholly or in chief value of glass or paste, or a combination of glass and paste, 65 per centum ad valorem; * * * table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass or paste, or combinations of glass and paste, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground * * * 55 per centum ad valorem: * * *.

The issue made in argument here is whether the imported articles are, in fact, scientific articles. In the court below several witnesses were called and examined to develop the use of this merchandise. These witnesses all agree as to the general uses of the various articles as hereinbefore set out. The specific issue made by their testimony seems to be as to whether they are used in a scientific way, by scientists, or in a utilitarian way, in business or trade, by laymen. A brief résumé of their testimony may be helpful.

Richard Wimmers, for the protestant, testified that the goods were sold to wholesale druggists, supply houses, wholesale hardware houses, and to wholesale malt and hops supply dealers, and not to laboratories, schools, etc.; that these articles were much inferior to the ones sold to schools, etc.; that they are made with printed scales, and that such scales are not accurate; that accurate scales are put on by hand; that the use of these instruments requires no skill; that the malt liquor testers (Exhibit C) are principally used by home-brewers, and the battery testers by those in the radio or automobile business; that these instruments are tested before being sold, and if their imperfections in scale are but slight they are sold.

H. L. Balderston, a witness called by the protestant, testified that he manufactured and sold goods like those imported; that they were sold to measure the approximate density of liquids; that these instruments are not suitable for use as scientific instruments, as they are not accurate enough; that he sold these articles to people who deal in "hootch supplies."

Charles C. Roberts, chief chemist of the Arthur H. Thomas Co., wholesalers and importers of laboratory and scientific apparatus, a witness for the Government, stated that he was familiar with the use of all of the imported articles except the malt and brew testers (Exhibit C); that his firm used the same and sold them to scientific laboratories; that such articles, with printed scales, have a definite use in such laboratories and are considered scientific instruments among chemists; that they are listed in the catalogues of his company as scientific instruments; that, for more accurate work, other methods and written-scale hydrometers are used; that an approximation is often a scientific test; that no hydrometers are absolutely perfect.

Francis Freas, a dealer in and manufacturer of hydrometers and thermometers, testified, for the Government, that he sold instruments like these in issue, to manufacturing institutions which maintain first-class laboratories, for laboratory use; that they are used in such laboratories for experimental purposes, by chemists; that he has also sold them to the University of Pennsylvania; that the malt and brew testers are sold for use in making homemade beer, and to vinegar companies; that the only practical use for the battery testers is the commercial use of testing batteries; that many of the imported articles are used by people in making alcoholic liquors, since the enactment of the national prohibition act.

L. B. McSorley, chief chemist of the United States customhouse at Philadelphia, also called by the Government, testified that he had used instruments like Exhibits A, E, B, and F in his laboratory for scientific purposes—namely, determining the specific gravity in liquids. That he has used the battery testers for determining the specific gravity in an electrolite.

The appellant argues that the facts developed in the case at bar lead to the conclusion that the imported goods are not scientific articles. Whether the scientific character of an article is to be determined by intrinsic character or principal use has been a debated question. The Supreme Court, in *Robertson* v. *Oelschlaeger*, 137 U. S. 436, in considering the language "philosophical apparatus and instruments," as it appeared in Schedule N of the Act of March 3, 1883, expressed the view that the use of the imported articles should govern their classification and determine whether they were philosophical apparatus or not. In *United States* v. *Presbyterian Hospital*, 71 Fed. 866, the Circuit Court of Appeals for the Second Circuit

430

held to the view that the intrinsic character of an article should determine whether it should be classified as philosophical and scientific apparatus or not. But *in re Massachusetts General Hospital*, 95 Fed. 973, affirmed by the Circuit Court of Appeals for the First Circuit in 100 Fed. 932, the Circuit Court of the District of Massachusetts again invoked the rule of principal use.

This court, in *United States* v. *Wyman & Co.*, 2 Ct. Cust. Appls. 440, T. D. 32200, and *United States* v. *Kastor & Bros.*, 6 Ct. Cust. Appls. 52, T. D. 35323, followed the rule of chief use announced in *Robertson* v. *Oelschlaeger, supra*, in passing upon the same statutory language.

All of the authorities cited, except *Robertson* v. *Oelschlaeger, supra*, deal with a provision of law securing free entry of scientific and philosophical apparatus, etc., for the use of institutions of learning. As a consequence, a liberal construction of the statute was given to effectuate the purposes for which it was enacted.

The statute now before us, paragraph 218, and its language, "all scientific articles * * * whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise," is new to the tariff laws, having made its first appearance in the Tariff Act of 1922. It has heretofore been called to our attention in *United States* v. *Chesterton Co., et. al.* 15 Ct. Cust. Appls. 175, T. D. 42232. There, water-gauge glasses were imported, and the question at issue was whether they were "scientific tubing" or "articles of blown glass." We there said:

The first portion of paragraph 218 is obviously intended to embrace all sorts of glass articles used for scientific purposes.

Again we said:

Therefore "scientific tubing," as commonly understood, means a collective assembly of glass tubes, or material for glass tubes, which is of, or pertains to, or is used in, science. Whether the merchandise here imported is of such a character raises a question of fact, to be determined from the record.

This is equally true in the case at bar. Whether these imported hydrometers and testers are scientific instruments is a question of fact, to be determined from their use as shown by the record. The court below has tried this question of fact and has found against the appellant. We can not say, from an inspection of the testimony, which we have hereinbefore set out quite fully, that the judgment of the court below is without evidence to support it, or is clearly contrary to the weight of the evidence. It should, therefore, not be disturbed.

It is argued quite earnestly that all the uses shown for the imported articles are utilitarian and not scientific; that testing storage batteries and illicit alcoholic liquors is not a scientific use. It is sufficient to say, as to this, that there is testimony in the record of other and, obviously, scientific uses in laboratories and institutions of learning.

But even if a scientific article be commonly used in the trades, that does not, in itself, render it any the less a scientific article. It will be observed the statute states: "Whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, *or otherwise*." (Italics ours.) This language is certainly broad enough to carry the use of scientific articles either in theoretical or applied science.

It should also be observed that we do not here hold that the determination of the scientific character of articles is to be made solely from its chief use. A consideration of the language of paragraph 218 last above quoted renders it advisable that that question, as in *United States* v. *Chesterton Co., supra,* be reserved for the future determination of the court, when the question shall be directly before us.

The judgment of the court below is *affirmed.*