(C. D. 811)

International General Electric Co., Inc. *v.* United States

## United States Customs Court, First Division

(Decided October 20, 1943)

Barnes, Richardson & Colburn (J. Bradley Colburn of counsel) for the plaintiff.
Paul P. Rao, Assistant Attorney General (John J. McDermott, special attorney), for the defendant.
Lamb & Lerch, amicus curiae.

Before OLIVER, WALKER, and COLE, Judges

OLIVER, Presiding Judge: The imported merchandise consists of an article known as a "Cathode Ray Tube," concededly in chief value of glass. It is used in television reception, being the article or device that receives the electrical impulses transmitted by the sending apparatus and converts them into light rays and projects them in the form of images on the glass top of this tube.

In appearance the tube resembles a gigantic glass flashlight, being about 15″ in length with protruding contact prongs at the base similar to a radio tube. It measures about 1¼″ in diameter at the base. The base, which is apparently made of rubber or some plastic material, is about 1″ in length and the glass tube, with its complicated electrical contents, is securely cemented inside the base where it is hermetically sealed so as to permit of a vacuum inside the tube. The balance of the tube is of glass blown in the mold. It extends from the base, in approximately the diameter of the base, for about 6½″ at which point it flares out at an angle of approximately 45° about 7″ where it is rounded at the edge and measures about 9″ across the top. This top is slightly convex, is milky in color, and is the surface or screen on which the television image is produced. The entire glass portion of the article from a point about 1¾″ from the base to practically the edge of the rounded opaque portion is dark gray in color. This is caused by a graphite coating on the inside of the tube.

These tubes were classified for duty at 60 per centum ad valorem as articles composed in chief value of glass under the provisions of paragraph 218 (f) of the Tariff Act of 1930. Plaintiff in its protest filed against this classification claimed these articles to be properly dutiable at lower rates of duty under various paragraphs of the tariff act, but at the trial and in the brief filed on its behalf plaintiff relies entirely upon the claim that these tubes are properly dutiable at 30 per centum ad valorem under paragraph 216, as amended by the trade agreements with France (T. D. 48316) and with the United

Kingdom (T. D. 49753), covering "articles composed in part of * * * graphite."

The Government, on the other hand, while not seeking to uphold the collector's classification as an "article composed wholly or in chief value of glass" under paragraph 218 (f), contends that paragraph 218 (a) covering "all scientific articles, and utensils, whether used for experimental purposes * * * or otherwise * * * wholly or in chief value of glass," is the paragraph under which these tubes should properly be classified and that as it is a use provision it will prevail over a provision covering articles composed either in "chief value" or "wholly or in part" of a material. The Government contends that we should overrule the protest without affirming the action of the collector.

The competing paragraphs, insofar as pertinent, read as follows:

PAR. 218 (f) * * * all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, * * *.

PAR. 216 [as amended by trade agreements with France, T. D. 48316, and the United Kingdom, T. D. 49753] * * * articles or wares composed wholly or in part of * * * graphite * * * not specially provided for * * *.

PAR. 218 (a) * * * all scientific articles, and utensils, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, * * * wholly or in chief value of glass, * * *.

Plaintiff introduced the testimony of two qualified witnesses. The Government produced no witnesses. Both plaintiff's witnesses were engineers, one being in charge of cathode ray tube development for the plaintiff corporation, and the other being in charge of its television receiving department. There was no dispute as to the purposes or the method of functioning of these tubes, which one of the witnesses described as follows (R. pp. 31/33):

A. The transmission of television images from the studio through the transmitter, and to the receiver, and finally so that a person can see the image, is rather complicated. It consists of the transmission of audio reception picture signals. The audio part of the transmission is very similar to radio broadcasting. In other words, there is a loud speaker in the home. It reproduces the program. That is well known. The receiver, in addition, has to receive in addition to the audio program, the picture signal, which is finally reproduced by this picture tube. The study of the pick-up and transmission of pictures is somewhat more complicated than the audio transmission by virtue of the necessity for conveying a great deal more information, but substantially the processes are quite similar, except for the pick-up tube. The transmission through the air to the receiver antenna—receiving antenna, is similar for the picture and audio signals. A common antenna is used at the receiver, one antenna to pick out the picture and video signals. The video signals are the picture signals. In the receiver both signals come in and are amplified, or converted in frequency, so that they may be utilized in the reproduction, in the final reproduction. The video signal, that is, the picture signal, may be considered to consist of two parts, the sign consisting impulses and the picture impulses. It is necessary at all times that the receiver operation be synchronized with the transmitted signal operation so that a complete

picture is produced instead of a complicated mass of dots. The signal in the receiver is amplified and the picture impulses finally come to the grid of this tube where they shut on or off, or control the entrance of the electro-beam which comes to the screen. When this beam hits the screen it produces light, but in order to produce a picture it is necessary that we cover the entire screen the size of a picture by stretching this beam rapidly across the screen in a logical manner. The picture signals in the receiver cause this beam of electrons to be varied so that we can have light and dark portions of the picture. The synchronizing impulses which I told about are used to synchronize the deflection current in the yoke, which is put on the neck of the tube. These currents are of a certain type, so that the beam of electrons moves first across the top of the tube, and then at a slightly longer line, etc., all the way across to cover the whole screen, so that a complete picture is produced, and as that beam moves it may be varied in intensity so as to produce a picture. The graphite screen is part of the story. It performs several functions. It helps to focus the spot. It helps to collect the final current which comes off from the screen as well as the secondary electrons which are flashed back to the screen. An important action of this graphite is to prevent a single light spot from here from producing by reflection light over some other area of the screen. In other words, the graphite is an absorbing device, so that we will not have a distorted picture in the reproduction. This particular tube is used on one of the commercial television receivers which we have built, and which are on the market, and have been sold. The 12 inch version of this tube has also been sold in commercial television receivers.

These cathode ray tubes are likened by the witnesses, not to radio tubes, but rather to the loudspeaker on a radio set. As the speaker on a radio set translates into sound the electric impulses received by the radio tubes, the tubes at bar translate into light waves and thus into pictures, by a process known as television, the impulses received by the television receiving set.

The first question for us to determine is whether or not, upon the record before us, defendant has established that these cathode ray tubes are scientific acticles within the meaning of that term as used in paragraph 218 (a). This is a question of fact to be determined from their use as shown by the record. (*O. G. Hempstead & Son v. United States*, 16 Ct. Cust. Appls. 427, T. D. 43173.) We may not speculate or substitute our personal opinions for evidence. This is not a proper subject for judicial notice. The effect these tubes produce is little short of miraculous. They snatch electric waves from the ether and translate them into light waves reproducing forms, articles, and scenes remote from the place of origin. That this action stirs the imagination and baffles the understanding of the man in the street does not of itself entitle the device to classification as a scientific article or utensil. This is subject to proof and there is no such evidence in the record before us. There is no evidence that these tubes are used in scientific laboratories or for academic purposes or for teaching or study or for the advancement of knowledge or wisdom and that they are susceptible of such use. (*Shell Petroleum Co. v. United States*, 59 Treas. Dec. 1342, T. D. 44947.) There is no testimony in this record to indicate that these tubes are used in either

pure or applied science. (*W. L. Conover* v. *United States*, 17 C. C. P. A. 324, T. D. 43743.) In fact, there is no evidence that these tubes are in any way scientific, meaning "pertaining to or used in science." (*O. G. Hempstead & Son* v. *United States, supra.*) On the contrary, the record indicates that these tubes are successfully and substantially used in commercial pursuits. On the entire record we are unable to find that these cathode ray tubes are scientific articles as claimed by the Government.

The real issue before us is whether the presumptively correct collector's classification of the imported articles under paragraph 218 (f) as "articles * * * composed in chief value of glass, blown or partly blown in the mold or otherwise," should be sustained, or whether the classification claimed by the plaintiff under paragraph 216 for "articles * * * composed wholly or in part of * * * graphite" should prevail. It is conceded that these tubes are in chief value of glass blown in the mold. Here the plaintiff has assumed the burden of establishing that the collector's classification is wrong and that its claim under paragraph 216 is correct. Plaintiff has established that the graphite part of these tubes is essential to their proper functioning. Plaintiff contends that as between a provision for articles composed "wholly or in chief value of" and a provision for articles composed "wholly or in part of" some material, that the latter, being the more restricted, will prevail. We cannot agree with this contention which is not supported by the authorities.

The leading case on this question is *Hartranft* v. *Meyer* (135 U. S. 237) where the conflict under the Tariff Act of 1883 was between schedule K for "* * * all manufactures of wool of every description, made wholly or in part of wool * * *" and schedule L for "All goods, wares, and merchandise * * * made of silk or of which silk is the component material of chief value * * *." The Supreme Court there held squarely that a provision covering "component material of chief value" would prevail over a provision for "wholly or in part of" a material. There have been some decisions contrary to this doctrine, notably, *United States* v. *Altman et al.* (107 Fed. 15) and *United States* v. *Rouss* (113 Fed. 816). These latter cases, however, have been held to be in conflict with the better authority on the subject and have not been followed by our appellate court (*Bough* v. *United States*, 14 Ct. Cust. Appls. 60, T. D. 41575). A distinction has been drawn between the wording "*articles* composed in part of" and "*manufactures* of which * * * is the component material of chief value." In such a case the word "articles" has been held to be more specific than "manufactures." *Louis Metzger & Co.* v. *United States* (146 Fed. 132); *United States* v. *Guthman, Solomons & Co.* (159 Fed. 273); *Calumet Manufacturing Co.* v. *United States* (44 Treas. Dec. 403, T. D. 39938, G. A. 8722); *Bough* v. *United*

States, supra; and *United States* v. *Foo Chow Importing Co.* (51 Treas. Dec. 321, T. D. 42055).

A further distinction has been made by our court between a provision for articles "in part of" a material related to a general provision for the same class of material. A provision for articles composed in part of graphite was held to be more specific than a provision for manufactures in chief value of earthy or mineral substances, graphite being an earthy or mineral substance (*Pfaltz & Bauer* v. *United States*, 54 Treas. Dec. 353, T. D. 43035). In like manner this court has held that a provision for articles in part of bamboo was more specific than one for manufactures in chief value of wood, bamboo being a particular kind of wood (*Calumet Manufacturing Co.* v. *United States*, *supra*).

The first time this precise question was before our appellate court was in *United States* v. *Vandergrift & Co.* (3 Ct. Cust. Appls. 161, T. D. 32457). The court there emphatically approved the doctrine enunciated in *Hartranft* v. *Meyers, supra*, saying:

> This case is authority for the proposition that the term "manufactures composed wholly or in part of wool" is less specific than the term "manufactures of which silk is the component material of chief value." Upon that question it is, and by reason of its convincing logic should be, conclusive, and has been so regarded. *United States* v. *Johnson* (154 Fed. Rep. 752); *United States* v. *Johnson* (157 Fed. Rep. 754); *United States* v. *Slazenger* (113 Fed. Rep. 524).

The precise question was again before our courts in *Loewenthal* v. *United States* (6 Ct. Cust. Appls. 209, T. D. 35464), where the appellate tribunal discussed it at great length and again approved the doctrine that as between two such provisions, the one providing for "articles in chief value of" would prevail. The doctrine in this case was cited with approval by our appellate court in *D. C. Andrews & Co.* v. *United States* (25 C. C. P. A. 437/450, T. D. 49507).

The cathode ray tubes at bar are composed in part of graphite (paragraph 216), but they are also conceded to be composed in chief value of glass (paragraph 218 (f)). Under the doctrine set forth above the latter provision must prevail.

The protest is overruled and the classification of the collector is sustained. Judgment will enter accordingly.